IN THE MATTER OF: K.N.M.
No. COA09-706
Court of Appeals of North Carolina
Filed November 17, 2009
Sharp, Michael, Graham & Evans, L.L.P., by Steven D. Michael, for petitioner-appellee, Dare County Department of Social Services.
Pamela Newell Williams for respondent-appellee Guardian ad Litem.
Windy H. Rose for respondent-appellant mother.
Sofie W. Hosford for respondent-appellant father.
ELMORE, Judge.
Respondent-mother and respondent-father (together, respondents) appeal from an order terminating their parental rights to their daughter, K.N.M. For the following reasons, we affirm.
In March 2008, Dare County Department of Social Services (Dare County DSS) filed a juvenile petition alleging that K.N.M., then nineteen months old, was neglected and dependent. The petition alleged that, on 4 March 2008, respondent-mother struck respondent-father during an argument over money, that K.N.M. was in the home at the time of the incident, and that respondent-mother reported that it had been several days since she had catheterized K.N.M., who has spina bifida. Dare County DSS noted in its petition that the Pasquotank County Department of Social Services (Pasquotank DSS) was involved with respondents in 2007 following domestic violence and neglectful care of K.N.M. The petition further alleged that respondent-father had been diagnosed with paranoid schizophrenia and mental retardation and respondent-mother had been diagnosed with explosive mood swings and mental retardation. Dare County DSS took non-secure custody of K.N.M.
The trial court held an adjudication and disposition hearing on 15 May 2008. By order filed 21 July 2008, the trial court adjudicated K.N.M. a neglected juvenile. The trial court found that respondent-father stipulated to the allegations concerning the neglect of K.N.M. The trial court further found that K.N.M. requires consistent medical and physical care as she has suffered repeated urinary tract infections and needs to be catheterized four times a day. The trial court also found that respondents receive disability income through Social Security as a result of their conditions, that respondents had not obtained needed and recommended mental health treatment, and that respondents were "unwilling and/or unable" to meet the needs of K.N.M.
With respect to disposition, the trial court found that after Pasquotank DSS transferred the family's file to Dare County DSS on 5 February 2008, Dare County DSS conducted a home visit and observed that respondent-mother was pregnant and in need of medical and psychological care. The trial court found that respondent-mother was currently living with her mother; that she had not visited with K.N.M., but had called about her welfare; and that respondent-mother had told a DSS social worker, "I can't take care of her, so you all can keep her." As to respondent-father, the trial court found that he had moved into a house where he pays $200.00 per week in rent, that he sold his car to pay off his bills, that he does odd jobs to make additional money, that he visits and loves K.N.M., and that he had not acquired the skills to manage K.N.M.'s medical appointments and catheterization. The court found that "both parents suffer from mental illnesses and did not adequately demonstrate that they could care for themselves or for [K.N.M.]" The trial court also found that, because of her special needs, K.N.M. needed a home that could properly address her medical and physical needs. The trial court entered a temporary disposition order in which custody of K.N.M. was continued with Dare County DSS and her foster care placement continued.
The trial court continued the final disposition hearing on 24 June and 15 August 2008. The trial court conducted a final disposition hearing on 17 September 2008, which respondents did not attend. On 29 September 2008, the trial court entered its final disposition order, in which it found that K.N.M. continues to live in the foster home where she was placed in March 2008, that the foster family understands her medical requirements, that she enjoys day care, that she has responded well to physical therapy, and that she has seen her mother once since March 2008 and her father once since the first week of July 2008.
With respect to respondents, the trial court found: (1) respondents lived together in Elizabeth City, but had not received services to address their extensive history of domestic violence; (2) neither respondent appeared to have an understanding of K.N.M.'s special needs or the ability to carry out the tasks necessary to ensure her needs are met; (3) neither respondent had seen K.N.M. since the last hearing on 15 August 2008; (4) respondents had each only attended one mental health appointment for therapy and two meetings with the psychiatrist for medication; (5) respondents had been urged to involve themselves in mental health counseling since March 2008, but had refused counseling until one month before the hearing; (6) respondent-mother asked the Pasquotank County DSS to take her newborn, Mary[1]; and (7) Dare County DSS was concerned about respondents' ability to meet K.N.M.'s basic needs, as respondents become confused and have difficulty managing their lives.
The trial court further found that, at the 15 August 2008 hearing, the court had made it clear to respondents "that they had to show progress towards reunification with [K.N.M.] or the Court would be left with no other option other than to cease reunification efforts." The trial court found that "minimal progress, if any, ha[d] been made since August 15, 2008" by respondents. Based on these findings, the trial court ceased reasonable efforts to reunite K.N.M. with respondents and noted that respondents' attorneys "objected to the cessation of reasonable efforts by the Court." The trial court continued custody with DSS and placement in foster care.
On 16 October 2008, the trial court conducted a permanency planning hearing. Respondents did not attend the hearing. By order filed 17 November 2008, the trial court found that K.N.M.'s needs were being met in the foster home placement, that she had made significant progress, that she continued to thrive in her foster home setting, that the foster parent has demonstrated that she can provide for all of K.N.M.'s special needs, and that the foster parent "loves and is committed to providing" K.N.M. with a home and family on a permanent basis. The trial court further found that "attempts at working with the parents to address their mental health and domestic violence issues first began in October of last year. In the year that has passed, no progress has been made by the parents and they now have another child for whom they cannot care." The trial court also found that Dr. Thomas Durham, who performed a psychological evaluation of respondent-father on 13 June 2008, stated: "I do not see that [respondent-father] can provide safe, effective care to a young child much less a child with a physical handicap that requires specialized medical care on a daily basis." The permanent plan was changed from reunification to adoption.
On 25 November 2008, DSS filed a petition to terminate the parental rights of respondents based upon neglect pursuant to N.C. Gen. Stat. § 7B-1111(a)(1). The termination hearing was originally scheduled for 23 January 2009. At the hearing, however, respondents' moved for a continuance to allow more time to prepare and the trial court allowed the motion, which motion the trial court granted. The trial court subsequently held a hearing on the termination petition on 5 March 2009. Respondents did not appear at the hearing and, before testimony was taken, the trial court discharged respondents' guardian ad litems (GALs).
At the termination hearing, Deputy County Sheriff Jeff Ambrose testified about the 4 March 2008 domestic violence incident in which respondent-mother hit respondent-father in the eye during an argument. Social Worker June Banks testified about the services the family received from Pasquotank County DSS in 2007 for K.N.M. and in 2008 after Mary was born. Social worker Victoria Smith and Child Protective Services Supervisor Melissa Williams testified about the services the family received from Pasquotank County DSS after Mary was born in 2008. Dare County DSS Social Work Supervisor Nancy Huff testified about the services Dare County DSS made available to respondents and the progress made by K.N.M. since she came into DSS custody in March 2008. At the disposition phase of the hearing, Cathy Spencer of the Roanoke Island Presbyterian Day Care testified about K.N.M.'s emotional and physical development since attending the day care in June 2008. The trial court also received into evidence written reports from K.N.M.'s GAL and Dare County DSS.
In an order filed 31 March 2009, the trial court found and concluded that grounds existed to terminate the parental rights of respondents based upon neglect. The trial court further concluded that it was in the best interest of K.N.M. that respondents' parental rights be terminated. Respondent-mother and respondent-father appeal separately.

Respondent-Mother's Arguments
Respondent-mother first assigns error to the trial court ceasing reasonable efforts to reunify the family in its 17 September 2008 disposition order. Respondent-mother, however, has not preserved this argument for our review because she failed to provide a notice of appeal, written or oral, following the disposition order. A parent may only appeal an order ceasing reunification efforts pursuant to N.C. Gen. Stat. § 7B-1001(a), which provides, in relevant part:
(5) An order entered under G.S. 7B-507(c) with rights to appeal properly preserved as provided in that subsection, as follows:
a. The Court of Appeals shall review the order to cease reunification together with an appeal of the termination of parental rights order if all of the following apply:
1. A motion or petition to terminate the parent's rights is heard and granted.
2. The order terminating parental rights is appealed in a proper and timely manner.
3. The order to cease reunification is assigned as an error in the record on appeal of the termination of parental rights.
N.C. Gen. Stat. § 7B-1001(a)(5) (2007). Section 7B-507(c) provides, in relevant part:
(c) . . . At any hearing at which the court finds and orders that reasonable efforts to reunify a family shall cease, the affected parent, guardian, or custodian or that parent, guardian, or custodian's counsel may give notice to preserve the parent, guardian, or custodian's right to appeal the finding and order in accordance with G.S. 7B-1001(a)(5). Notice may be given in open court or in writing within 10 days of the hearing at which the court orders the efforts to reunify the family to cease.
N.C. Gen. Stat. § 7B-507(c) (2007).
The record on appeal does not include a written notice of appeal from the trial court's disposition order. In addition, respondent-mother did not include a copy of the disposition hearing transcript and, therefore, we cannot determine whether she gave notice of appeal in open court. Although finding of fact 55 of the disposition order shows that respondent-mother's attorney "objected to the cessation of reasonable efforts by the Court"; this objection was not sufficient to satisfy § 7B-1001(a)(5)'s requirement that the right to appeal an order ceasing reunification efforts must be preserved pursuant to § 7B-507(c). Accordingly, we do not review this argument.
Respondent-mother next argues that the trial court erred by discharging her GAL at the beginning of the termination hearing. Respondent-mother asserts that her GAL "should have protected the interests of the mother throughout the hearing[.]" Respondent-mother did not appear at the termination hearing and the trial court denied counsel's motion to continue the hearing. Respondent-father's GAL asked to "be allowed to not participate" because respondent-father was not there and so she did not "have anyone to counsel." The trial court responded: "You  you would be excused from this hearing and [respondent-mother's GAL] would be excused from this hearing. I mean, there's no point in y'all just sitting here unless, for some reason, either counsel for the parents feel like there may be something that you would have to add by way of testimony." The trial court asked respondent-mother's counsel whether she had "any issue with releasing [respondent-mother's GAL]" and she replied, "I would have no objection to releasing him." The trial court then released both GALs and continued conducting the hearing.
A parent's appointment of a GAL is governed by N.C. Gen. Stat. § 7B-1101.1, which states, in relevant part:
(c) On motion of any party or on the court's own motion, the court may appoint a guardian ad litem for a parent if the court determines that there is a reasonable basis to believe that the parent is incompetent or has diminished capacity and cannot adequately act in his or her own interest. The parent's counsel shall not be appointed to serve as the guardian ad litem.
* * *
(e) Guardians ad litem appointed under this section may engage in all of the following practices:
(1) Helping the parent to enter consent orders, if appropriate.
(2) Facilitating service of process on the parent.
(3) Assuring that necessary pleadings are filed.
(4) Assisting the parent and the parent's counsel, if requested by the parent's counsel, to ensure that the parent's procedural due process requirements are met.
N.C. Gen. Stat. § 7B-1101.1(c) and (e) (2007).[2]
Here, after the petition for termination of parental rights was filed, the trial court, on its own motion, appointed a GAL for respondent-mother pursuant to N.C. Gen. Stat. § 7B-1101.1(c). Pursuant to N.C. Gen. Stat. § 7B-1101.1(e), respondent-mother's GAL attended the originally scheduled January 2009 termination hearing, joined with respondent-mother's counsel's motion to continue the hearing, and he attended March 2009 termination hearing. There is no requirement that a GAL must remain at a termination hearing when the incompetent parent he is charged with counseling is absent. In addition,
A GAL appointed pursuant to section 7B-1101.1 does not possess the same authority as a guardian appointed pursuant to Chapter 35A. "The essential purpose of guardianship [appointed pursuant to Chapter 35A] for an incompetent person is to replace the individual's authority to make decisions with the authority of a guardian when the individual does not have adequate capacity to make such decisions.["] N.C. Gen. Stat. § 35A-1201(a)(3) (2005) (emphasis added). In contrast, a GAL's authority is more limited. . [T]he language of the General Assembly is clear that the GAL's role is limited to one of assistance, not one of substitution. The General Assembly could have stated that the GAL was authorized to enter consent orders, accept service of process, file pleadings, or otherwise act on a parent's behalf, but it did not.
In re L.B., 187 N.C. App. 326, 329, 653 S.E.2d 240, 242 (2007) (citations omitted). Because a GAL's role is limited to assistance and does not extend to substitution, respondent-mother's GAL could not have represented respondent-mother's interest in respondent-mother's absence during the termination hearing. Accordingly, the trial court did not err by discharging respondent-mother's GAL at the beginning of the termination hearing.

Respondent-Parents' Arguments
We next address whether the trial court erred by finding and concluding that sufficient grounds existed to terminate respondents' parental rights. "The standard for appellate review of the trial court's conclusion that grounds exist for termination of parental rights is whether the trial judge's findings of fact are supported by clear, cogent, and convincing evidence, and whether these findings support its conclusions of law." In re McMillon, 143 N.C. App. 402, 408, 546 S.E.2d 169, 174 (2001).
Both respondent-mother and respondent-father contend that the trial court erred by concluding that they neglected K.N.M. pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), which provides that a "court may terminate the parental rights upon a finding" that "[t]he parent has . . . neglected the juvenile. The juvenile shall be deemed to be . . . neglected if the court finds the juvenile to be. . . a neglected juvenile within the meaning of G.S. 7B-101." N.C. Gen. Stat. § 7B-1111(a)(1) (2007). Section 7B-101 defines a "neglected juvenile" as
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
N.C. Gen. Stat. § 7B-101(15) (2007). If the child has been removed from the parents' custody before the termination hearing, and the petitioner presents evidence of prior neglect, including an adjudication of such neglect, then "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (citation omitted).
When, as here, a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, a trial court may find that grounds for termination exist upon a showing of a "history of neglect by the parent and the probability of a repetition of neglect." In re Shermer, 156 N.C. App. 281, 286, 576 S.E.2d 403, 407 (2003) (citation omitted). With respect to respondents, the trial court found that K.N.M. had previously been adjudicated neglected and that there was a probability of future neglect if she were returned to respondents' custody.
To support its conclusion that respondent-mother and respondent-father neglected K.N.M., the trial court made the following relevant findings of fact:
35. On January 2, 2008, [respondents] were together and told the Pasquotank County social worker that they would seek counseling. [Respondent-father] made an appointment for January 8, 2008 but did not attend the appointment and [respondent-mother] had not made an appointment.
43. The parents were not attending appointments made for them and would not allow the Pasquotank Department of Social Services into the house where they were residing. They also only called the foster parents on two occasions to inquire about [Mary].
44. [Respondent-father] had been scheduled to see Susan Chapel at Albermarle Mental Health. He missed two appointments in January, 2009 because he stated he was moving. She had not seen him since December of 2008.
45. [Respondent-mother] has not been seen by anyone for counseling for several months. When questioned about this, she states "I will get around to it". Neither of the parents work[.] [Respondent-father] does odd jobs here and there. They have had numerous residences, having moved four times since Ms. Smith became involved in August of 2008. The last residence Ms. Smith went to, they would not allow her inside and they occupied only a room. They currently are . . . sharing a mobile home with an individual whose last name they do not know. They were living with [respondent-mother's] mother until December 29, 2008 when they were requested to leave due to disagreements . . . .
46. Pasquotank Department of Social Services has offered to allow the parents to use their phone in order to make appointments when they are at their office to schedule domestic violence counseling, but the parents have not done so.
48. The parents are not in a position to care for a child and neither parent can plan for a child, they are unable to arrange transportation, unable to budget their income, and as Ms. Smith stated, they "just cannot do it".
50. The parents visited [K.N.M.] on December 4th, 11th and 19th and there have been no further visits since then and no requests for visits have been made.
53. The parents have neglected [K.N.M.] and have made no progress in addressing the issues which caused her to be neglected. The parents have obtained no counseling for domestic violence; have not established a stable living environment; having moved repeatedly throughout the life of this case; have failed to obtain counseling and take medications as prescribed for their mental health conditions; are not capable of budgeting their income; [respondent-mother] has been unemployed throughout the life of this case and [respondent-father] only works occasionally; the parents refuse to seek out services that would benefit themselves and their minor child; and the parents have a concerning lack of understanding about the seriousness of [K.N.M.]'s medical condition causing great concern for the Court about whether or not either parent could see that [K.N.M.] was properly catheterized, received appropriate medications and attended medical appointments. [Respondent-mother's] statement that [K.N.M.] would "grow out" of her need for catheterization is very concerning to the Court.
54. The parents, since being first involved with the Pasquotank County Department of Social Services and then the Dare County Department of Social Services have shown that they are unwilling to take advantage of services that are offered and are unwilling to ask for even the most basic services such as assistance with transportation. The parents seem to be perfectly content to let [K.N.M.] and their second child reside with others and to see their children on a very occasional basis. Both parents have stated a number of times to the social workers that they were unable to care for [K.N.M.] or their other child and the Court certainly views this as a correct assessment of their situation.
56. The likelihood of [K.N.M.] being neglected again if returned to the care of either or both of her parents is almost certain. Nothing has changed about this case since its inception and in fact, the situation of the parents seems to be worse than it was when the case started.
With regard to the above findings of fact, respondent-mother challenges findings of fact 35, 46, and 48 and claims that the remaining findings of fact are not sufficient to terminate her parental rights. However, uncontested findings of fact 50, 53, 54, and 56 show that, as of the date of the termination hearing, respondent-mother was unable to maintain stable housing, failed to attend counseling, and was unable to care for K.N.M.'s medical condition. We hold that these uncontested findings of fact provide sufficient support for the trial court's conclusion of law that K.N.M. was a neglected juvenile.
Respondent-father challenges findings of fact 53 and 56. With respect to finding of fact 53, respondent-father specifically challenges the court's finding that he "failed to obtain counseling and take medications as prescribed for [his] mental health conditions" and that respondent-father "only works occasionally." At the termination hearing, Supervisor Melissa Williams testified that, by July 2008, neither parent had obtained mental health assistance. Social worker Victoria Smith testified that, since September 2008, respondent-father had seen Susan Chapel at Albermarle Mental Health Center twice and that he had seen his psychiatrist twice; she also testified that he had missed two appointments in January 2009. The DSS report stated that respondent-father did not initiate mental health services until after July 2008 and that the "services have been inconsistent." In addition, Supervisor Nancy Huff testified that she was not aware of respondents currently participating in any type of counseling. As to respondent-father's work, the GAL report stated that he worked odd jobs.
With respect to finding of fact 56, respondent-father specifically challenges the court's finding that "the situation of the parents seems to be worse than it was when the case started." The evidence shows that, after K.N.M. was placed in foster care in March 2008, Mary was born and was also placed in DSS custody. The evidence also shows that respondent-father visited K.N.M. only sporadically, failed to obtain counseling, and failed to maintain stable housing. This evidence supports the trial court's finding that K.N.M.'s situation at the time of the termination hearing was worse than when K.N.M. was first taken into custody.
Both parents argue that the trial court improperly abdicated its fact-finding responsibility by taking judicial notice of the underlying case file and adopting findings of fact verbatim from previous court orders. For support, they point to our opinion in In re J.S., 165 N.C. App. 509, 598 S.E.2d 658 (2004). In In re J.S., the trial court entered "a cursory two page order" that "did not incorporate any prior orders or findings of fact from those orders." Id. at 511, 598 S.E.2d at 660. The only findings of fact that the trial court included were "a court report from DSS and a mental health report," which the order incorporated by reference. Id. Although "this Court repeatedly has held that a trial court may take judicial notice of earlier proceedings in the same case," In re W.L.M., 181 N.C. App. 518, 523, 640 S.E.2d 439, 442 (2007) (citations omitted), a "trial court may not delegate its fact finding duty," In re J.S., 165 N.C. App. at 511, 598 S.E.2d at 660 (citation omitted). Consequently, we concluded in In re J.S. that it was reversible error for the trial court to "broadly incorporate these written reports from outside sources as its findings of fact." Id.
Here, however, the trial court made fifty-six findings of fact that spanned twenty-eight pages in its adjudication order. The disposition order includes sixty-one findings of fact that span nine pages. In addition, the court here incorporated prior orders and findings of fact from those orders. Accordingly, In re J.S. is inapposite to the case at hand. Furthermore, respondents do not point us to anything in the record that suggests that the trial court failed to "find the facts specially" or was simply reciting allegations at the expense of logical reasoning. See In re Harton, 156 N.C. App. 655, 660, 577 S.E.2d 334, 337 (2003). Indeed, the trial court specifically stated that it "ha[d] fully reviewed said files, reports and Orders for the purpose of making the findings herein and except for one non-secure custody Order" and that "the undersigned ha[d] conducted all other hearings and previously made the findings contained in the prior Orders." In addition, the trial court prefaced all of its findings of fact by stating that it had "found the facts as set out hereafter which this Court also finds from clear, cogent and convincing evidence after reviewing the Order, records, reports and evidence in the juvenile Court file." Therefore, we hold that the trial court did not err by taking judicial notice of the previous orders and setting out the findings of these previous orders in its termination of parental rights order. Accordingly, we overrule this argument.
Finally, we address respondents' claim that the trial court abused its discretion by terminating respondents' parental rights. Both respondents argue that it was not in the best interest of K.N.M. to terminate their parental rights.
When determining whether terminating a parent's rights is in the juvenile's best interest, a trial court shall consider the following factors:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen. Stat. § 7B-1110 (2007). Here, the trial court made the following findings of fact to support the court's determination that it was in K.N.M.'s best interest to terminate respondents' parental rights:
47. [K.N.M.] is a young child who has been in foster care for one year. Like any child, she needs safety and stability in addition to a loving and nurturing environment. Due to her medical needs, [K.N.M.] requires a great deal of extra care and a caregiver who is attentive and willing to meet those needs. [K.N.M.] has strong emotional attachments to her foster family and her foster parent desires to adopt her.
49. [Respondents] have not demonstrated a genuine interest in [K.N.M.] as evidenced by their lack of contact with her and the Department concerning her.
50. The Dare County Department of Social Services recommends that the parental rights of [respondents] be terminated to make it possible for this child to be adopted, and that she remain in the legal custody of this Department until the adoption can be finalized.
51. From the testimony of Jeannie Brake, Guardian Ad Litem, the Court finds that the Dare County [Department] of Social Services has offered weekly visitation to the parents. There have been no visits since December 19, 2008.
52. [K.N.M.] needs to be in a loving, safe and nurturing home as she has many complex physical needs due to her spina bifida and hydrocephalus.
53. The Guardian Ad Litem's opinion is that it is in [K.N.M.]'s best interest that termination of parental rights occur as [K.N.M.] has many complex, physical needs that can not be met by [her] biological parents. [K.N.M.] needs a safe, caring and protective environment to live and develop. [K.N.M.] is 2 1/2 years old and the foster family would like to be [K.N.M.]'s "forever family". Termination of the biological parents' parental rights will enable [K.N.M.] to be adopted and have a chance to grow and develop a lasting and meaningful relationship with a family that can provide a safe, caring and protective environment for her.
54. The Guardian Ad Litem describes the relationship between [respondent-mother] and [K.N.M.] as weak; however, [K.N.M.] enjoys the time she spends with [respondent-father] as he is very affectionate to her.
55. The bond between the child and her current caretaker is outstanding and [K.N.M.] has certainly won the hearts of her foster family.
58. Kathy Spencer is the Director of Island Presbyterian Daycare which [K.N.M.] attends. [K.N.M.] first entered in June of 2008 and Ms. Spencer observed her to be very detached, not happy and did not play with the other children or the teachers. She showed no emotions, was underweight and did not eat well. After approximately six weeks, Ms. Spencer observed that she was doing better and was responding well to the foster family. By September 2008, [K.N.M.] was playing with her classmates and beginning to use words. By December of 2008, [K.N.M.] had become very affectionate with the staff and the foster mother was very involved with her and was coming to pick [K.N.M.] up to take her to and from all of her medical treatments. Ms. Spencer did an evaluation on March 9, 2009 and observed that [K.N.M.] has emerged socially and likes to be noticed, and that she is truly a remarkable little girl at this point. She is very affectionate, likes to play and shows affection to others. Ms. Spencer has observed a wonderful interaction with her foster mother and the foster mother's two other children. She observed the foster mother's commitment to [K.N.M.] was 100%.
59. [K.N.M.] is deserving of a life where she lives in a safe and secure environment surrounded by individuals who love her and will nurture her development. Her development while with her foster family shows what [K.N.M.] is capable of and what she can be. Her parents are completely lacking in the skills necessary to meet her needs and it would be in her best interest that their rights be terminated.
60. The conduct of the parents has been such as to demonstrate that they will not promote the healthy and orderly physical and emotional well being of the child.
61. The minor child is in need of a permanent plan of care at the earliest possible age and this can [] only be obtained by severing [] the relationship between the child and her parents by termination of parental rights.
Here, the trial court's findings of fact are supported by DSS and GAL reports and testimony from Pasquotank County social workers June Banks and Melissa Williams, Dare County Social Work Supervisor Nancy Huff, and the director of K.N.M.'s day care. Based upon these findings, we conclude that the trial court made a reasoned decision and did not abuse its discretion by determining that terminating respondents' parental rights was in the best interest of the minor child. Accordingly, we affirm the order of the trial court.
Affirmed.
Chief Judge MARTIN and Judge BEASLEY concur.
Report per Rule 30(e).
NOTES
[1] "Mary" is not the juvenile's real name.
[2] We note that the legislature has amended N.C. Gen. Stat. § 7B-1101.1(c) to read that a "court may appoint a guardian ad litem for a parent in accordance with G.S. 1A-1, Rule 17," effective 1 October 2009. 2009 N.C. Sess. Laws 311. See, e.g., In re L.B., 187 N.C. App. 326, 330, 653 S.E.2d 240, 243 (2007) (discussing the difference between a guardian appointed pursuant to Rule 17, who may "exercise legal rights in lieu of the respondent parents," and a GAL, whose role is merely to assist the parents). We observe that this amendment may affect the outcome of cases brought after 1 October 2009 but has no effect on the case at hand.